UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-2400

VERIZON CORPORATE SERVICES CORPORATION,

Plaintiff - Appellee,

v.

COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,

Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Peter J. Messitte, Senior District
Judge.  (8:08-cv-00097-PJM)

Argued: October 28, 2009          Decided: January 25, 2010

Before WILKINSON and NIEMEYER, Circuit Judges, and Anthony J.
TRENGA, United States District Judge for the Eastern District of
Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Stephen Koslow, CWA, AFL-CIO, Rockville, Maryland, for
Appellant.  Julia McAree Broas, JONES DAY, Washington, D.C., for
Appellee.  **ON BRIEF**: Willis J. Goldsmith, JONES DAY, New York,
New York, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The district court set aside an award entered pursuant to a labor arbitration between the Communication Workers of America (the "Union") and Verizon Corporate Services Corporation ("Verizon") on the ground the arbitrator "ignored" "critical language in the Collective Bargaining Agreement" and "introduce[d] some of his own brand of industrial justice." The court concluded that the award was beyond the scope of the arbitrator's authority.

After a careful review of the record and consideration of counsels' arguments, we affirm.

I

When, in December 2004, Verizon began transferring the tasks of transporting, unboxing, and checking inventory items from higher paid "storekeepers" to lower paid "assistant technicians" at its assembly facility in Martinsburg, West Virginia -- the Verizon Advanced Resources and Technology Center ("VARTAC") -- the Union filed a grievance, arguing that the work should have remained assigned to storekeepers, as provided for in a 2001 letter agreement between Verizon's vice president, Michael Millegan, and the Union (the "Millegan Letter"). The Millegan Letter, agreed to after the Union had likewise objected

2

when Verizon had assigned the tasks to assistant technicians in 2000, provided that storekeepers would perform the tasks.

In 2003, some two years after the Millegan Letter, the 2000 collective bargaining agreement ("CBA") between Verizon and the Union expired, and the parties negotiated a new one. During negotiations, Verizon proposed broadly expanding the duties of assistant technicians, but the Union rejected the proposal. Nonetheless, the parties agreed to a "letter of understanding" (the "AT Letter"), which became part of the 2003 CBA, assigning to assistant technicians at company assembly facilities (the VARTAC plant) the duties to "transport[], uncrate[] and inventor[y] equipment."

The 2003 CBA also included a "Continuation Letter," which provided that all "local agreements" that were valid under the prior 2000 CBA and "which ha[d] not been separately renegotiated by the parties in 2003 negotiations," would continue in effect for the life of the 2003 CBA. The Continuation Letter also provided that local agreements that had been renegotiated during the 2003 CBA negotiations would "speak for themselves."

Beginning in December 2004, Verizon began reassigning the tasks of transporting, unboxing, and checking inventory to assistant technicians, in accordance with the AT Letter that was part of the 2003 CBA. The Union filed a grievance over Verizon's action, contending that the tasks should have remained

3

with storekeepers, as provided in the Millegan Letter, because, it asserted, the Millegan Letter survived the 2003 CBA pursuant to the Continuation Letter. When the parties were unable to resolve the grievance, they selected arbitrator James J. Sherman to resolve it.

After concluding that the Millegan Letter was an enforceable local agreement, arbitrator Sherman concluded that the Millegan Letter survived the 2003 CBA, reasoning as follows:

> Management argued that regardless of the status of Mr. Millegan's local agreement, that agreement became null and void in 2003 when the parties entered into another master contract. The Arbitrator cannot agree. The evidence shows that even though the Millegan letter was discussed, and Management expressed its opinion that the letter did not qualify as a binding agreement, there is nothing in this new (2003) contract which indicated that both parties accepted this view.
>
> On the contrary, the contract appears to say quite the opposite. Section C of Article 41 contains two paragraphs which appear to incorporate the letter and intent contained in Mr. Millegan's letter.
>
> The third paragraph states, in essence, that all local agreements that were valid and enforceable under the 2000 contract will continue in effect for the life of the new agreement. Then the forth [sic] paragraph makes the same point in slightly different language.

The arbitrator then noted that, because "[h]e could not say with the necessary confidence that either side prevailed with a preponderance of the evidence," he would rely on Verizon's conduct following the 2003 CBA to rule in favor of the Union. He determined that the evidence slightly favored the Union due

4

to the fact that Verizon had continued to assign the disputed tasks to storekeepers for some period after the 2003 CBA became effective, demonstrating that "[m]anagement did not repudiate Mr. Millegan's local agreement immediately or even soon after the new [2003] contract went into effect." The arbitrator thereupon entered an award directing Verizon to comply with the terms of the Millegan Letter.

Verizon commenced this action to have the award vacated, and the Union filed a counterclaim to have it enforced. On cross-motions for summary judgment, the district court vacated the award.

While the district court recognized that the Millegan Letter was a binding agreement, it concluded that the Letter did not survive the 2003 CBA by reason of the AT Letter and the Continuation Letter, which were part of the 2003 CBA. First, the court noted that the arbitrator erroneously referenced "section C of Article 41" to make a reference to the Continuation Letter when no such section existed. And on the merits, the court noted that the arbitrator failed to recognize that the parties, as part of the 2003 CBA, entered into the AT Letter, which in fact reassigned the disputed tasks to assistant technicians. The Continuation Letter explicitly indicated that any local agreements that had been renegotiated would "speak for themselves." Because the duties of assistant technicians

5

addressed in the Millegan Letter were renegotiated in 2003, resulting in the AT Letter, the court concluded that the language of the AT Letter set aside task assignments made in the Millegan Letter. It characterized the arbitrator's discussion about Verizon's delay in reassigning the tasks as nothing more than the arbitrator "implementing his own brand of industrial justice."

From the district court's judgment vacating the award, the Union filed this appeal.

## II

When a collective bargaining agreement calls for resolution of a dispute through arbitration, the judicial role in reviewing the arbitration award is a limited one:

> Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. . . . [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 37-38 (1987). Mere disagreement with an arbitrator's construction of the labor contract is insufficient for a reviewing court to overturn the arbitrator's decision. United

Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598-99 (1960). Accordingly, federal courts do not judge the merits when reviewing labor arbitrations but simply examine whether the arbitrator actually delivered what was called for by the parties' agreement -- the arbitrator's interpretation of the collective bargaining agreement. Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers International Union, 76 F.3d 606, 608 (4th Cir. 1996) ("Above all, we must determine only whether the arbitrator did his job -- not whether he did it well, correctly, or reasonably, but simply whether he did it" (citing Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir. 1994))).

Even though an arbitrator's decision is largely free from review, courts must still review for instances in which an arbitrator abdicates his duty and actually fails to construe the collective bargaining agreement. Misco, Inc., 484 U.S. at 38 ("The arbitrator may not ignore the plain language of the contract . . ."). Courts must thus assure themselves that an arbitrator's award "is grounded in the collective bargaining agreement . . . ," as the arbitrator has no authority to exceed the scope of the parties' agreement. Champion International Corp. v. United Paperworkers International Union, AFL-CIO, 168 F.3d 725, 729 (4th Cir. 1999). When an arbitrator exceeds the

7

scope of contractually conferred authority, a court is bound to set aside the award:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. . . . [H]is award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

Enterprise Wheel & Car Corp., 363 U.S. at 597.

In this case, the arbitrator was bound to consider and apply the relevant contractual provisions defining the duties of assistant technicians, and the governing documents are not disputed. After Verizon began assigning inventory tasks at VARTAC to assistant technicians in late 2000, the parties agreed, in 2001, to the Millegan Letter, under which the tasks were reassigned to storekeepers, who were the higher paid employees. The 2003 CBA, however, which included both the AT Letter and the Continuation Letter, provided for the reassignment of inventory tasks back to assistant technicians. The parties expressly negotiated this change and memorialized it in the AT Letter. That Letter provided that "[t]he duties of an Assistant Technician will include the following: perform work in connection with placement, rearrangement and removal of wire and cable, and associated equipment in or on customers' buildings and in Company Assembly facilities. In connection

8

with these duties:  . . . [t]ransports, uncrates and inventories equipment." (Emphasis added). And the Continuation Letter, in turn, stated that local agreements that were "renegotiated during 2003 negotiations will speak for themselves" and that only prior local agreements that "ha[d] not been separately renegotiated by the parties in the 2003 negotiations" would continue to be applied. Thus, under the 2003 CBA, the parties explicitly agreed to reassign to assistant technicians the tasks that, under the Millegan Letter, had been assigned to storekeepers.

In rendering his decision, arbitrator Sherman did not even acknowledge the existence of the AT Letter, which was part of the 2003 CBA, much less address its terms. Yet, the language of the AT Letter explicitly addressed the grievance before him. For this reason, we agree with the district court that the arbitrator's decision did not derive from the 2003 CBA when the arbitrator failed to recognize and discuss a provision explicitly addressing the disputed issue. This is an archetypal case of an arbitrator ignoring the plain language of the CBA. See, e.g., Champion International Corp., 168 F.3d at 730-31 (vacating arbitration award granting bonuses where no contractual provision called for them); Mountaineer Gas Co., 76 F.3d at 608-10 (vacating arbitration award because the arbitrator ignored plain language of the agreement by making an

exception to the company's substance abuse policy where none had been provided by the contract language).

Accordingly, we affirm the judgment of the district court.

<u>AFFIRMED</u>