**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 96-9106
_____

D. C. Docket No. 1:95-CV-3284-JEC

WILLIAM SUMNER SCOTT,

Plaintiff-Appellant,

versus

PRUDENTIAL SECURITIES, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 18, 1998)**

Before BIRCH, Circuit Judge, FAY, Senior Circuit Judge, and
COHILL[*], Senior District Judge.

_____

[*] Honorable Maurice B. Cohill, Senior U.S. District Judge for
the Western District of Pennsylvania, sitting by designation.

BIRCH, Circuit Judge:

In this appeal, we decide whether the Member Arbitration Rules of the National Futures Trading Association ("NFA") permit NFA arbitrators to decide whether a dispute is arbitrable. We must also address whether an individual consents to arbitrate disputes with other members of the NFA by becoming an associate member of the NFA. In addition, the petitioner-appellant asks us to vacate the arbitration award entered below pursuant to section 10 of the Federal Arbitration Act, 9 U.S.C. § 10, and on the non-statutory ground that the award was arbitrary and capricious.[1] The district court held that the arbitrators did have the authority to determine issues of arbitrability but, upon conducting an independent review, the court made an alternative holding that the dispute was indeed subject to NFA arbitration. The district court also rejected Scott's attacks on the arbitrators' award and refused to vacate the award.

---

[1] Although the petitioner-appellant raises a number of additional challenges both to the arbitration award and to the district court's rulings below, we conclude they are without merit and decline to discuss them further.

Finally, the district court granted the respondent-appellee's motion to confirm the award. Although we hold that the district court erred when it found that the arbitrators had the authority to decide issues of arbitrability, we agree with the district court's alternative holding and its decision to confirm the arbitration award. We AFFIRM.

## BACKGROUND

William S. Scott ("Scott"), the petitioner-appellant, formed a Delaware corporation, Creative Strategies, Inc. ("CSI"), that acted as the general partner of a Pennsylvania limited partnership, the Creative Strategy Fund I, (the "Fund"). Scott was the sole shareholder of CSI and the sole limited partner of the Fund. The Fund subsequently opened a number of accounts with the respondent-appellee, Prudential Securities, Inc. ("PSI"), for the purpose of engaging in futures trading. Scott executed all the documents required to open these accounts but structured the transactions with the intent of avoiding personal liability for any

3

deficits in the accounts.[2] He specifically refused PSI's request that he execute a personal guarantee on the accounts.

These accounts lost a significant amount of money due to what Scott alleges were PSI's mistakes in trading the accounts on a margin. Scott further alleges that instead of correcting the mistakes, PSI forged documents to support the transactions and demanded payment for the deficit in the accounts. PSI then issued a demand for arbitration before the NFA against Scott, the Fund, and CSI. In October, 1992, the Fund filed a complaint with the Commodity Futures Trading Commission ("CFTC"), alleging that PSI had committed a number of transgressions in connection with the accounts and claiming damages. PSI responded by filing a counterclaim in the CFTC proceeding that demanded payment of the debit balances from Scott, the Fund, and CSI. The CFTC, however, refused to consider PSI's claims against Scott individually, and the

---

[2] Since the details of these arrangements are both lengthy and complex, we confine our discussion to the details necessary to understand the issues on appeal.

4

NFA granted a stay of PSI's arbitration proceedings pending the outcome of the CFTC hearing.

In 1994, an administrative law judge (the "ALJ") for the CFTC decided that the allegations regarding PSI's conduct were without merit and entered an award of $101,087.53 plus interest in PSI's favor. In 1995, the CFTC heard an appeal of the ALJ's decision and affirmed it in all material respects.[3] At PSI's request, the NFA then lifted the stay in the arbitration proceedings that PSI had initiated against Scott in his personal capacity and notified both parties that arbitration would commence on October 31, 1995.

On October 18, 1995, Scott petitioned the NFA to delay the arbitration pending the outcome of a motion the Fund had filed in the United States District Court for the Southern District of Florida seeking a temporary restraining order ("TRO") to enjoin the NFA proceedings. Scott also petitioned the NFA staff for the option of

---

[3]  The CFTC's confirmation of the ALJ's decision spawned a considerable amount of additional litigation.  Suffice it to say that another panel of our court affirmed the award without opinion. See Prudential Securities, Inc. v. Creative Strategy, Inc., 107 F.3d 26 (11th Cir. 1997).

participating in the arbitration by telephone. On October 25, 1995, the NFA denied Scott's request for a stay, and, on October 27, 1995, the arbitrators' denied Scott's request to participate by telephone. On October 30, 1995, the district court in Florida denied the Fund's request for a TRO to enjoin the NFA arbitration. The arbitrators subsequently commenced their hearing on October 31, 1995, in Scott's absence. That morning, the arbitrators also refused an attempted phone call from Scott, who sought either a delay in the hearing or the option of participating by telephone. The arbitrators did, however, accept and consider a fifty-six page affidavit detailing Scott's position on the dispute.

On November 20, 1995, a three-person NFA arbitration panel found that the Fund and CSI were Scott's "alter-egos" and pierced the corporate veil to hold Scott liable for the debts of those entities. The arbitrators awarded PSI $106,087.54 plus interest against Scott personally. Scott brought a motion to vacate the arbitration award in the United States District Court for the Northern District of

Georgia; PSI brought a motion to confirm the arbitration award. After a resolving a number of procedural disputes,[4] the district court granted PSI's motion to confirm the award and denied Scott's motion to vacate.

## DISCUSSION

On appeal, Scott argues that the district court erroneously decided that the NFA's Member Arbitration Rules gave the NFA arbitrators the authority to resolve disputes about arbitrability (*i.e.,* whether a particular dispute is subject to arbitration). Scott also appeals the district court's alternative holding that, even if the NFA arbitrators did not have the power to decide issues of arbitrability, the alter-ego liability dispute between PSI and Scott was nonetheless subject to arbitration. Finally, Scott attacks the

---

[4] Scott raises a number of these procedural disputes on appeal and asks us to reverse the district court's rulings. Upon review, we find his contentions to be without merit.

7

arbitrators' award on a number of different grounds and asks us to vacate the award pursuant to section 10 of the FAA, because the award was arbitrary or capricious, and because the NFA's filing fees violated his rights under the Florida Constitution. PSI defends the district court's opinion and the NFA arbitrators' award on all grounds and asks us to affirm the district court's confirmation of the award.

I.    Arbitrability of the Dispute

Scott argues that the NFA arbitrators did not have the authority to enter a judgment in his dispute with PSI. It is well established that arbitration is a creature of contract and no party can be compelled to submit a dispute to arbitration without having given prior contractual consent to do so. See AT&T Tech., Inc. v. Communications Workers, 475 U.S. 643, 649, 106 S. Ct. 1415, 1418, 89 L. Ed. 2d 648 (1986). Although the United States Supreme Court has made it clear that, the courts, not arbitrators, ordinarily will decide whether or not a particular dispute is arbitrable, the parties may choose to have arbitrators resolve even the question of

arbitrability.  Id. at 649, 106 S. Ct. at 1418  (unless the parties "clearly and unmistakably" provide otherwise "the question of arbitrability–whether . . . [an arbitration] agreement creates a duty for the parties to arbitrate the particular grievance–is undeniably an issue for judicial determination.").  The arbitrators in this case, by entering an award against Scott on the merits, implicitly decided that they had the power to decide questions of arbitrability and decided that the dispute was arbitrable.  As we must defer to the arbitrators' conclusion that the dispute was arbitrable only if we agree that the parties clearly and unmistakably consented to have them decide issues of arbitrability, see First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943, 115 S. Ct. 1920, 1923, 131 L. Ed. 2d 985 (1995), we will address that question first.

### A.    *Competence de la Competence*

In this case, section 2 of NFA Member Arbitration Rules, which requires all members and associates to arbitrate disputes, provides

the only possible justification for the arbitrator's implicit conclusion that they had the authority to resolve questions of arbitrability.[5] Scott, however, argues that the language in the NFA rules is not broad enough to permit the arbitrators to decide the issue of arbitrability.

The Supreme Court has explained that courts should not assume that parties have agreed to arbitrate arbitrability unless there is clear and unmistakable evidence to that effect. See First Options, 514 U.S. at 944, 115 S. Ct. at 1924 (quoting AT&T Tech., 475 U.S. at 649, 106 S. Ct. at 1418-19)). To determine whether the parties agreed to submit the question of arbitrability to the arbitrators, we must refer to "ordinary state-law principles that govern the formation of contracts." First Options, 514 U.S. at 944, 115 S. Ct. at 1924.

---

[5] Scott's arguments that he was not bound by the NFA's arbitration rules go to the issue of whether the arbitrators erred by finding that he had agreed to arbitrate the merits of the dispute rather than the issue of who should have decided that question. Accordingly, we leave Scott's argument on that point for subsequent discussion in part I(B).

Regrettably, neither the parties nor the district court have dwelt on the question of *which* state's principles of contract law govern this question. Scott apparently executed a Form 8-R, the document that registered him with the NFA, in Florida and sent it to the NFA in Illinois. Given that none of the relevant documents appears to contain a choice of law provision, it would appear that either Florida or Illinois law applies.[6] We, however, need not resolve this choice of law problem because the relevant law in both states is essentially in harmony. Both Florida and Illinois require courts to interpret a contract so as to give effect to the intent of the parties. See e.g.,

_____

[6] It is axiomatic that a federal district court, sitting in diversity, applies the choice of law rules of the state in which it sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Since the parties brought this case in the Northern District of Georgia, we observe that, in cases of contract construction, Georgia applies the law of the state where the parties made their agreement or where it is to be performed. See Allstate Ins. Co. v. Duncan, 218 Ga. App. 552, 553, 462 S.E.2d 638, 640 (1995). On the record in this case, therefore, either Florida or Illinois law applies. We note that, although the question of which state's law should govern this question is an important one, the courts have not focused upon this issue. See e.g., Paladino v. Avnet Computer Tech. Inc., 134 F.3d 1054, 1061 n.1 (11th Cir. 1998) (Tjoflat, J. and Cox, J. concurring)(noting that the parties had not specified which state's law should apply in a similar situation); Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Cohen, 62 F.3d 381 (11th Cir. 1995) (deciding that the parties had not clearly and unmistakably agreed to arbitrate arbitrability without a single reference to state law).

11

Mayflower Corp. v. Davis, 655 So. 2d 1134, 1137 (Fl. Dist. Ct. App. 1994) ("The intention of the parties governs the construction of contracts."); American States Ins. Co. v. Koloms, 687 N.E.2d 72, 75 (Ill. 1997) (same). More specifically, courts in both states have concluded that even broad, elastic language in an arbitration clause cannot, without more, support the clear and unmistakable conclusion that the parties intended to submit issues of arbitrability to arbitrators. The Supreme Court of Illinois, for example, recently held that a contract providing that "any controversy between us arising out of . . . this agreement shall be submitted to arbitration" was "at best, silent on the question of who should decide questions of arbitrability." Roubik v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 82752, (Ill. Feb. 20, 1998). A Florida court interpreting substantially similar contract language also held that the parties had not evidenced an intent, as a matter of Florida contract law, to permit the arbitrators to decide issues of arbitrability:

> The agreement in this case does not contain any language specifically authorizing the arbitration panel to decide arbitrability issues; nor does it contain any broad or all-inclusive language that implicitly authorizes the arbitration panel to decide such issues.

Romano v. Goodlette Office Park, Ltd., 700 So.2d 62, 64 (1997); accord North Augusta Assoc. Ltd. Partnership v. 1815 Exchange, Inc., 220 Ga. App. 790, 469 S.E.2d 759 (1996) (same under Georgia law).  But see Smith Barney Shearson, Inc. v. Sacharow, 91 N.Y.2d 39, 689 N.E.2d 884, 666 N.Y.S.2d 990 (1997) (reaching the opposite conclusion under New York law).[7]

Section 2 of the NFA's arbitration rules states that: "[e]xcept as provided in Sections 4 and 5 of these Rules . . . , disputes between and among Members and Associates shall be arbitrated under these Rules . . . ."[8] R1-7, Ex. G at 4.  The language at issue in this case, therefore, is substantially narrower than the arbitration clauses

---

[7] But see also Paine Webber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) ("The words 'any and all' are elastic enough to encompass disputes over whether . . . a claim is within the scope of arbitration.").

[8]  Section 2 contains a number of additional exceptions, none of which are relevant to this appeal.  See R1-7, Ex. G at 4.

discussed in the Illinois and Florida decisions above. Although we admit that the language of section 2 is susceptible to a reasonable construction in favor of permitting the arbitrators to determine arbitrability, we cannot conclude that section 2 evidences a "clear and unmistakable" commitment to that position under either Florida or Illinois principles of contract construction. Accordingly, we hold that the arbitrators did not have the power to rule on the question of whether Scott had consented to arbitrate.

B.    The District Court's Determination of Arbitrability

Given our decision that the parties did not consent to have the arbitrators determine whether their dispute was arbitrable, we now must make an independent determination of whether the parties' dispute was eligible for arbitration. See First Options, 514 U.S. at 943, 115 S. Ct. at 1924. In an alternative holding, the district court

expressly found that Scott had consented to arbitrate his dispute with PSI by virtue of his registration with the CFTC and his status as an associate member of the NFA. As we conduct our review of this alternative holding, we accept all findings of fact that are not clearly erroneous but decide questions of law de novo. Id. at 947-48, 115 S. Ct. at 1926.[9]

Scott argues that he never agreed to arbitrate disputes in front of the NFA. As we observed in United States Fidelity & Guar. Co. v. West Point Constr. Co., 837 F.2d 1507, 1508 (11th Cir. 1988) (per curiam), however, parties may bind themselves to arbitrate disputes by signing a contract that incorporates an arbitration agreement by reference. Moreover, in a case substantially similar to the one before us, another Court of Appeals has held that a petitioner who registered as an associate member of the NFA consented to arbitrate all disputes with other members or associates pursuant to

_____

[9] We note that the Supreme Court has rejected our circuit's previous practice of reviewing a district court's decision to confirm an arbitration award with the more lenient abuse of discretion standard. See First Options, 514 U.S. at 948, 115 S. Ct. at 1926.

15

the NFA Member Arbitration Rules that had been incorporated in his registration. See R.J. O'Brien & Assoc. v. Pipken, 64 F.3d 257, 260-261 (7th Cir. 1995).

Following the Pipken court's reasoning, the district court found that Scott was a CFTC-registered associated person.[10] Indeed, Scott admitted as much in the documents he filed with the district court, and PSI confirmed his status as an associated person by filing the uncontested affidavit of a paralegal who checked Scott's status with the NFA registration hotline.[11] In order to register with the CFTC as an "associated person," Scott completed and signed a Form 8-R application on April 12, 1992. The Form 8-R expressly notes that it constitutes an application for "registration . . . as an

[10] The Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 1-25, regulates those who participate in transactions involving commodities futures. Persons who actively participate in that industry, including futures commissions merchants, introducing brokers, and *associated persons* must register under the CEA. See 7 U.S.C. §§ 6f(a) & 6k(1). For a more complete explanation of the regulatory system, including Congress's delegation of the registration function to the CFTC and NFA, see Pipkin, 64 F.3d at 259.

[11] As an associated person Scott was, by definition, required to register as an associate member of the NFA. See Pipkin, 64 F.3d at 261 (citing the NFA Member Arbitration Rules).

16

Associated Person . . . and application for <u>NFA Associate Membership</u>." R1-7, Exh. J at 2 (emphasis added). The Form 8-R also states that execution of the application constitutes "an express agreement by [the applicant] that, if registered as an Associate, [the applicant] shall become and remain bound by all NFA requirements as *then and thereafter in effect*." <u>Id.</u> at 7 (emphasis added). Article XVIII(u) of the NFA's Articles of Incorporation and Rule 1-1(q) of the NFA's Compliance Rules both define the term "requirements" as "any duty, restriction, procedure, or standard imposed by a charter, bylaw, rule, regulation, resolution or similar provision." <u>Id.</u>, Ex. K at 3, 5. The NFA added one such requirement on May 1, 1992, when it adopted its Member Arbitration Rules. Section 2 of those rules provides for mandatory arbitration of disputes "between and among Members and Associates." <u>Id.</u>, Exh. G. at 4.

Although we have already held that this language was not broad enough to constitute a clear and unmistakable agreement to arbitrate issues of arbitrability, our independent review of the district

court's decision leads us to conclude that the district court correctly held that Scott had agreed, in his personal capacity, to arbitrate disputes with other members and associates of the NFA.  PSI's status as a member of the NFA--not its trading relationship with the Fund--, therefore, gave it the right to demand arbitration of the dispute with Scott because PSI and Scott were both subject to the NFA's arbitration regime.  See Pipken, 64 F.3d at 260-61.

Scott emphasizes that his dealings with PSI had no nexus to his Form 8-R registration or his association with the NFA, but no such nexus is necessary to support our finding that Scott had agreed to arbitrate his dispute with PSI.[12]  Nothing in section 2 limits the availability of arbitration to disputes that are somehow connected to the parties' association with the NFA.  Moreover, none of Scott's

---

[12]  In making this argument, Scott repeatedly asserts that he structured the Fund's accounts with PSI with the specific intent to avoid individual liability. Indeed, relying on this logic Scott essentially denies that *he* has any dispute with PSI at all. Scott's arguments about the structure of the accounts and his personal liability, however, have nothing to do with the issue at hand: whether Scott's personal status as an associate member of the NFA required him to arbitrate the merits of an alleged dispute with PSI.

attacks on the arbitrators' jurisdiction over his dispute with PSI go to the specific exceptions to NFA arbitration enumerated in section 2 of the Member Arbitration Rules. Finally, we must resolve any doubts about the scope of arbitrable issues in favor of arbitration. See First Options, 514 U.S. at 944-45, 115 S. Ct. at 1924.[13] Accordingly, we affirm the district court's alternative decision and hold that Scott was subject to NFA arbitration pursuant to the arbitration clause enumerated in section 2 of the NFA's Member Arbitration Rules, as incorporated as a requirement for his membership in the NFA.

II.    Grounds for Vacating the Arbitration Award

Scott also challenges the arbitrators' award on Section 10 of the FAA and on non-statutory grounds. Although Scott (having received the benefit of a generous reading of his district court filings)

_____

[13]   As the First Options Court explained, this is precisely the reverse of the presumption that we applied to the question of whether the parties agreed upon who should decide the question of arbitrability.  Id. at 944-45, 115 S. Ct. at 1924-25.

has raised a number of legally cognizable attacks on the arbitration award, the overwhelming thrust of his argument is that the arbitrators misapplied the law to his case. It is settled law, however, that "[c]ourts are generally prohibited from vacating an arbitration on the basis of errors of law or interpretation."[14] O.R. Sec. Inc. v. Professional Planning Assoc., 857 F.2d 742, 746 (11th Cir. 1988) (citing Wilko v. Swan, 346 U.S. 427, 74 S. Ct. 182, 98 L. Ed. 168 (1958), overruled on other grounds, Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989)). With this caveat firmly in mind, we examine Scott's arguments in support of vacating the arbitration award.

Having determined that the arbitrators had jurisdiction to determine the merits of the dispute between PSI and Scott, our review of their decision is necessarily limited. We must "give

---

[14] For this reason, we will not address Scott's contention that the arbitrators' award ignores applicable principles of corporate law or Florida's statute of frauds.

20

considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." First Options, 514 U.S. at 943, 115 S. Ct. at 1924 (citing 9 U.S.C. § 10). The FAA does not permit courts to "roam unbridled" in their oversight of arbitration awards. Marshall & Co. v. Duke, 941 F. Supp. 1207, 1210 (N.D. Ga. 1995) (internal quotation omitted), aff'd, 114 F.3d 188 (11th Cir. 1997) (per curiam). Scott, as the moving party, bears the burden of setting forth sufficient grounds to vacate the arbitration award. See O.R. Sec., Inc., 857 F.2d at 746. Finally, as explained above, we accept the district court's findings of fact to the extent they are not clearly erroneous and review questions of law de novo. See Marshall & Co., 114 F.3d at 188.

    A.   Statutory Grounds

Section 10 of the FAA provides a number of specific statutory bases for vacating an arbitration award.[15]  Scott urges us to vacate the NFA's arbitration award on the following three grounds: (1) the arbitration award was procured by fraud, see 9 U.S.C. § 10(a)(1); (2) the arbitrators exhibited evident partiality, id. § 10(a)(2);  and (3) the arbitrators were guilty of misconduct, id. § 10(a)(3).  We find Scott's arguments concerning fraud before the arbitrators to be without merit,[16] but address his remaining contentions in turn.

_____

[15]  Section 10 of the FAA provides in pertinent part:
(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration–
    (1) Where the award was procured by corruption, fraud, or undue means.
    (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
    (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
    (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. . . .
9 U.S.C. § 10.

[16]  Scott's briefs on the fraud argument all but admit that the arbitrators had all the material information before them, a fact that precludes vacatur under § 10(a)(1). See Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1383 (11th Cir. 1988); accord A.G. Edwards & Sons, Inc. v. McCollough, 967 F.2d 1401, 1404 (9th Cir. 1992) (per curiam) ("where the fraud or undue means is not only

22

First, Scott asserts that the district court should have vacated the arbitration award because the arbitrators were biased against him. Section 10 of the FAA permits vacatur "where there was evident partiality or corruption in the arbitrators." 9 U.S.C. § 10(a)(2). To vacate an arbitration award for evident partiality, the moving party must present evidence that would support a "reasonable impression of partiality" on the arbitrator's behalf. See Lifecare Int'l, Inc. v. CD Med., Inc., 68 F.3d 429, 433 (11th Cir. 1995), modified on other grounds, 85 F.3d 519 (11th Cir. 1996). The assertion of partiality, however, must be "direct, definite and capable of demonstration rather than remote, uncertain and speculative." Id. (quoting Middlesex Mut. Ins. Co. v. Levine, 675 F.2d 1197, 1202 (11th Cir. 1982)).

discoverable, but discovered and brought to the attention of the arbitrators a disappointed party will not be given a second bite at the apple."). We decline Scott's invitation to overrule Bonar and note that, even if we were so inclined (and we are not), the law in this circuit is emphatic that only the entire court sitting en banc can overrule a prior panel opinion in the absence of an intervening Supreme Court decision. See United States v. Woodard, 938 F.2d 1255, 1258 (11th Cir. 1991) (per curiam).

Scott's allegations of partiality arise out of the fact that each of the arbitrators in his case are in the business of collecting debit balances from customers.[17] Scott, therefore, alleges that because he sought to avoid the collection of such a debit he could not receive a fair hearing before the arbitrators in question. As evidence in support of his contentions, Scott attacks the arbitration award against him and argues that it is so unsupported by the law that it could have only been the product of partiality.[18]

---

[17] Scott arrives at this conclusion because each of the arbitrators assigned to hear his case have connections to Futures Commissions Merchants, who, he alleges, are the only entities entitled to collect debit balances from customers under the CEA. Scott also argues that, because persons with such ties to Future Commissions Merchants dominate the NFA, he could not receive a fair hearing. Such an attack on the forum, however, is far too attenuated to satisfy the prerequisites for an attack under § 10(a)(2). See Woods v. Saturn Distrib. Corp., 78 F.3d 424, 427-30 (9th Cir. 1996) (rejecting a claim of bias based on the arbitrators' dependence on the makers of Saturn automobiles); Pompano-Windy City Partners v. Bear, Sterns & Co., 698 F. Supp. 504, 517 (S.D.N.Y. 1988) (similar ruling in the securities context).

[18] Scott repeats this tactic throughout his briefs by injecting his disagreement with the arbitrators on the merits of the dispute into his discussions of the arbitrators' jurisdiction and his arguments for vacatur under section 10. We will address Scott's contention that the arbitrators disregarded the law below, but decline his invitation to conflate that dispute with the section 10 analysis.

Scott's claims amount to precisely the vague, remote, and speculative charges that we have held cannot support an order to vacate an arbitration award. Scott's allegations attack only the nature of experience that the arbitrators have in the commodities trading business and assume a bias against his position. The courts have repeatedly explained, however, that an arbitrator's experience in an industry, far from requiring a finding of partiality, is one of the factors that can make arbitration a superior means of resolving disputes. See, <u>Commonwealth Coatings Corp. v. Continental Cas. Co.</u>, 393 U.S. 145, 150, 89 S. Ct. 337, 340, 21 L. Ed. 2d 301 (White, J., concurring) ("It is often because they are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function."). Moreover, Scott has neither pointed us to any evidence of either actual bias on the part of the arbitrators nor identified any business connection to PSI that the arbitrators failed to disclose to the parties before undertaking the

dispute.[19] Accordingly, we affirm the district court's decision not to vacate the arbitration award for evident partiality.

Second, Scott argues that the NFA arbitrators, by refusing to postpone the arbitration hearing and refusing to allow Scott to participate by telephone, were guilty of misconduct. The FAA permits a district court to vacate an arbitration award in the event that: (1) the arbitrators refused to postpone the hearing upon the showing of sufficient cause; (2) the arbitrators refused to hear pertinent and material evidence; or (3) the arbitrators were guilty of any other misbehavior that resulted in prejudice to the rights of any party. See 9 U.S.C. § 10(a)(3). As the district court correctly observed, however, a mere difference of opinion between the arbitrators and the moving party as to the correct resolution of a procedural problem will not support vacatur under section 10(a)(3).

---

[19] Scott also alleges that NFA's Chairman of the Board is the president of a company that has a dispute with the Fund. Without any assertion that this particular individual played any role in his case, however, Scott's allegations remain too vague and attenuated to support a finding of evident partiality under our case law.

See generally Robbins v. Day, 954 F.2d 679, 685 (11th Cir. 1992) ("An arbitrator enjoys wide latitude in conducting an arbitration hearing."), overruled on other grounds, First Options, 514 U.S. at 948, 115 S. Ct. at 1926.  Moreover, we must recall the basic policy behind arbitration, which is to permit parties to resolve their disputes in an expeditious manner without all the formalities and procedures that might attend full fledged litigation.  See Schmidt v. Finberg, 942 F.2d 1571, 1573 (11th Cir. 1991).

We note that the express language of the statute requires the party seeking a postponement to advance a "sufficient cause" for the delay. 9 U.S.C. § 10(a)(3).   In reviewing an arbitrator's refusal to delay a hearing, we must decide whether there was "any reasonable basis" for failing to postpone the hearing to receive relevant evidence. Schmidt, 942 F.2d at 1574.  In Schmidt, for example, we held that an arbitration panel's possible reliance on any one of a number of factors, including the desire for an expeditious resolution of the dispute, justified its refusal to postpone a hearing to

accommodate a party's competing scheduling obligations and, therefore, did not require the vacatur of an arbitration award. Id. at 1574-74; see also ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1464 (10th Cir. 1995) (party's "flimsy" claim of unavailability due to overseas travel was insufficient to require delay of the arbitration); accord Hilliard v. J.C. Bradford & Co., 494 S.E.2d 38, 44 (Ga. App. 1997) (a flare-up in a party's long-term, stress related illness the evening before a scheduled arbitration hearing did not require a postponement).

In this case, the district court found that Scott had not advanced any compelling excuse for his absence before the arbitrators on October 31, 1995. Scott argued that he could not appear before the arbitrators in Atlanta because the demands of ongoing litigation in Miami required his presence there. The evidence is undisputed, however, that Scott was under no *court imposed* obligation to stay in Miami.[20] Moreover, the district court in Miami rejected Scott's

_____

[20] Scott devotes a great deal of his brief to a letter prepared by PSI's counsel that states Scott faced no court imposed

28

application for a TRO to enjoin the arbitration on October, 30, 1995, the day before the arbitration was to begin. Scott's arguments amount to nothing more than the self-imposed scheduling obstacles that we have held do not require an arbitrator to postpone a hearing. Accordingly, we affirm the district court's decision on this point.

Next, Scott argues that the arbitrators committed misconduct by refusing to allow him to participate in the arbitration hearing by telephone. Whether we consider this argument as a refusal to consider pertinent evidence or as "other misbehavior," under section 10(a)(3), we note that Scott must show that the arbitrators' refusal to permit him to participate by telephone caused him some prejudice. See Marshall & Co., 941 F. Supp. at 1212. An arbitrator need not consider all the evidence the parties seek to introduce but may reject evidence that is cumulative or irrelevant. See Robbins, 954 F.2d at 685. Scott argues that, had he been permitted to participate by telephone, he would have been able to explain how

barrier to appearing before the arbitrators on October 31, 1995. His arguments and allegations on this matter are without merit.

PSI had disregarded the limitations on the Fund's accounts. This evidence, however, was irrelevant to the question of alter-ego liability before the NFA arbitrators. Accordingly, the arbitrators did not refuse to consider pertinent evidence by refusing Scott's participation by telephone.

Finally, the arbitrators did not engage in misconduct that denied Scott his right to a fair hearing. As we observed in Robbins, the FAA permits arbitration to proceed "with only a summary hearing and with restricted inquiry into factual issues. . . . [The arbitrator] need only give each party *the opportunity* to present its arguments and evidence." 954 F.2d at 685 (emphasis added) (citations omitted). Although the arbitrators refused Scott's participation by telephone, the arbitrators did conduct a hearing, of which Scott had notice and the opportunity to attend, and they considered Scott's fifty-six page affidavit setting out his arguments and evidence. Accordingly, we find no misconduct on the part of the arbitrators and affirm the

30

district court's decision not to vacate the arbitration award on the statutory grounds.

B.    Non-Statutory Grounds

In addition to the grounds for vacatur set out in the FAA, the courts have recognized a number of non-statutory grounds that permit a district court to vacate an arbitration award.  In the Eleventh Circuit, a party may challenge an arbitration award without reliance on the FAA if the award is: (1) arbitrary and capricious; (2) in contravention of public policy; or (3) entered in "manifest disregard of the law."  See Montes v. Shearson Lehman Bros, Inc., 128 F.3d 1456 (11th Cir. 1997) (describing the first two grounds and adopting the third).  On appeal, Scott has limited his argument to his contention that the arbitrators' award was arbitrary and capricious.[21]

---

[21]  We note that, before the Montes opinion, an attack based on the arbitrators' manifest disregard of the law was not an option in this circuit–a point not lost on either PSI or the district court.  As Montes was not delivered until November 24, 1997–more than a month after oral argument in this case–the parties have not briefed the issue.  Although we typically do not consider arguments not raised by the parties on appeal, we note that Scott's briefs make clear his charge that the NFA arbitrators (as well as the ALJ

An arbitration award will not be held to be arbitrary and capricious unless "a ground for the arbitrator's decision can[not] be inferred from the facts of the case." Raiford v. Merrill Lynch, Pierce, Fenner & Smith, 903 F.2d 1410, 1413 (11th Cir. 1990) (internal quotation omitted). In Raiford, for example, we held that the arbitrators' calculation of a damage award was not arbitrary and capricious because, although the arbitrators had not given any explanation of their award, "the arbitrators *could have* fashioned their award based on any number of valid reasons." Id. (emphasis added). Similarly, in this case, it is not difficult to discern a reason for the arbitrators' decision to hold Scott liable for the debts of the Fund. The facts of this case and the arbitrators' award suggest that the

---

and CFTC arbitrators) have ignored the law. We further note, however, that Scott's arguments do not approach the type of disregard for the law that we found in Montes. In that case, we found that one of the parties had expressly conceded that the law did not support his position and urged the arbitrators to ignore the law to find in his favor. See Montes, 128 F.3d at 1461. That particular fact led us to distinguish the case from our precedents refusing to vacate an award that the moving party claimed to be the product of legal error, and led us to vacate the award for manifest disregard of the law. Id. at 1461-62; see also id. at 1464 (Carnes J., concurring). The record in this case and Scott's arguments suggest nothing more than a disagreement over the application of the law not its manifest disregard.

arbitrators were convinced that Scott so dominated and controlled the Fund and CSI that he ought to be held liable for their debts on a theory of alter-ego liability. Scott's attempts to argue that this conclusion was arbitrary and capricious amount to nothing more than a rehashing of his disagreements with that result. As we have observed before, a mere error in the application of the law will not support the reversal of an arbitration award. See Montes, 128 F.3d at 1460. Accordingly, we hold that the district court correctly denied Scott's pleas to vacate the arbitration award.[22]

## CONCLUSION

On appeal, Scott asks us to reverse the district court's ruling that the NFA's Member Arbitration Rules gave the arbitrators the

---

[22] Scott's arguments that the NFA's excessive filing fees violate his right of access to the courts, guaranteed by Florida's Constitution, are without merit. Even if Scott could somehow convince us that *Florida's* constitutional protections apply to an allegedly *federal* agency's conduct of an arbitration hearing in *Georgia*, his arguments find no support in Florida law. See Terminix Int'l Co. v. Ponzio, 693 So. 2d 104, 109 (Fla. Dist. Ct. App. 1997) ("The short answer to these arguments [invoking Florida's constitutional protections] is that the plaintiffs waived these rights by consenting to arbitrate . . . ."). Scott's equal protection attack on the same NFA fee, in addition to having no merit, was raised for the first time on appeal. See Irving v. Mazda Motor Corp., 136 F.3d 764, 769 (11th Cir. 1998) (declining to address an argument not raised in the district court).

power to resolve issues of arbitrability. He also asks that we reverse the district court's alternative, independent holding that his status as an associate member of the NFA required him to arbitrate this dispute with PSI. Finally, he urges us to vacate the arbitration award for a variety of statutory and non-statutory reasons. We hold that the district court erred when it found that the NFA Member Rules gave the arbitrators the authority to determine whether the dispute was subject to arbitration. We agree, however, with the district court's independent holding that Scott's association with the NFA required him to arbitrate the dispute with PSI. We also find no error in the district court's decision to deny Scott's motion to vacate the arbitration award or its decision to confirm that award in PSI's favor. Accordingly, we AFFIRM the decision of the district court.